AO 91
Rev. 11/97

**CRIMINAL COMPLAINT**

ORIGINAL

| UNITED STATES DISTRICT COURT | CENTRAL DISTRICT OF CALIFORNIA |
|---|---|

| UNITED STATES OF AMERICA v. LUIS MARTIN ROSAS-CRISOSTOMO and GUILLERMO RAMIREZ | DOCKET NO. |
|---|---|
| | MAGISTRATE'S CASE NO. 8- **SA08-418 M** |

Complaint for violation of 18 U.S.C. §§ 1028(a)(1), 2

| NAME OF MAGISTRATE JUDGE MARC L. GOLDMAN | UNITED STATES MAGISTRATE JUDGE | LOCATION Santa Ana, CA |
|---|---|---|

| DATE OF OFFENSE September 2006-present | PLACE OF OFFENSE Orange County | ADDRESS OF ACCUSED (IF KNOWN) |
|---|---|---|

COMPLAINANT'S STATEMENT OF FACTS CONSTITUTING THE OFFENSE OR VIOLATION:

From in or around January 2008 to May 2008, in Orange County, within the Central District of California, defendants Luis Martin ROSAS-Crisostomo and Guillermo RAMIREZ, aiding and abetting each other, knowingly and without lawful authority produced false identification documents in violation of 18 U.S.C. Sections 1028(a)(1) and 2.

| BASIS OF COMPLAINANT'S CHARGE AGAINST THE ACCUSED: (See attached affidavit which is incorporated as part of this Complaint) | FILED - SOUTHERN DIVISION CLERK, U.S. DISTRICT COURT AUG - 8 2008 CENTRAL DISTRICT OF CALIFORNIA DEPUTY |
|---|---|
| MATERIAL WITNESSES IN RELATION TO THIS CHARGE: | |

| Being duly sworn, I declare that the foregoing is true and correct to the best of my knowledge. | SIGNATURE OF COMPLAINANT Troy Kennedy |
|---|---|
| | OFFICIAL TITLE Special Agent-DHS-ICE |

Sworn to before me and subscribed in my presence,

| SIGNATURE OF MAGISTRATE JUDGE (1) MARC L. GOLDMAN | DATE August 8, 2008 |
|---|---|

1) See Federal Rules of Criminal Procedure rules 3 and 54.

JLW;lnz          REC: Warrant

# A F F I D A V I T

I, Troy Kennedy, being duly sworn, depose and state:

## INTRODUCTION AND PURPOSE OF AFFIDAVIT

1.    I am a Special Agent (SA) with the United States
Department of Homeland Security (DHS), Immigration and
Customs Enforcement (ICE), formerly the Immigration and
Naturalization Service (INS), and have been so employed
since August 2004.  Prior to that, I was an Immigration
Enforcement Agent with INS from June 2001 to August 2004.
Prior to that, I was a Border Patrol Agent with INS from
January 1998 to October 1999.  I have attended the United
States Border Patrol Academy in Charleston, South Carolina
and the Criminal Investigator Training Program and
Immigration and Customs Enforcement Special Agent Training
at the Federal Law Enforcement Training Center in Glynco,
Georgia.  I am currently assigned to the Assistant Special
Agent in Charge, Orange County (ASC/OR) investigating cases
related to benefit and document fraud.

2.    This affidavit is made in support of search
warrants for a single-family residence located at 921 N.
Clementine Street, Anaheim, California, 92805 (the
"RESIDENCE PREMISES") and D.J.'s Video Store located at 632
W. La Palma Avenue, Anaheim, California, 92805 (the

1

"BUSINESS PREMISES") (collectively the "SUBJECT PREMISES"),
which are more fully described in Attachments A-1 and A-2,
respectively.   As set forth below, there is probable cause
that located at the SUBJECT PREMISES is evidence of
violations of Title 18, United States Code, Sections 1028
(a)(1): Producing False Identification Documents and 1028
(a)(5): Possession of Document Making Implements, which is
more fully described in Attachment B.

    3.   This affidavit is also in support of criminal
complaints and arrest warrants for Luis Martin ROSAS-
Crisostomo and Guillermo RAMIREZ for violating Title 18,
United States Code, Section 1028(a)(1) (Producing False
Identification Documents) and Section 2 (Aiding and
Abetting).

    4.   The information contained in this affidavit is
the result of my own personal investigation and information
communicated to me by other law enforcement officers
familiar with these facts.   Unless specifically indicated
otherwise, all conversations, statements and other
information described in this affidavit are related in
substance and in part only.   This affidavit is intended to
show that there is probable cause for the requested
warrants and does not purport to set forth all of my
knowledge of or investigation into this matter.

## BACKGROUND REGARDING FRAUDULENT
## DOCUMENT MANUFACTURING OPERATIONS

5.    Based on my training and experience, I know that fraudulent immigration document manufacturing operations are a common problem in the Orange County area.  Fraudulent document manufacturing schemes usually follow recognizable patterns.  In general, a fraudulent document manufacturer creates "false identification documents," which include Permanent Resident Alien Cards (I-551) and social security cards that he/she sells to individuals who are in need of United States identity documents to obtain employment and are unable to lawfully obtain them.  A typical fraudulent document vendor's method of operation is as follows:

a.    The fraudulent document vendor (known as a "Mikero") meets an individual requesting false identification documents, quotes a price, and collects necessary photographs and biographical information needed to complete the false identification document order.

b.    Generally, the Mikero hands the order to a person (known as the "Runner") who delivers the information to the fraudulent document manufacturer that creates the documents.

c.    The fraudulent document manufacturer creates the documents using a photograph of the individual, and a

variety of computer software and hardware including but not limited to, scanners, desktop computers, computer document templates, specifically created computer document programs, and printers. The fraudulent document manufacturer can also create documents using a typewriter and a lamination machine. The individual requesting the fraudulent documents either furnishes personal identification information contained on the fraudulent documents or the fraudulent document manufacturer randomly generates it.

d. When the documents are complete, the fraudulent document manufacturer provides the finished false identification documents to the Runner.

e. The Runner then returns the false identification documents to the Mikero.

f. The Mikero then meets with the individual who placed the order. The Mikero then provides the individual who placed the order with the false identification documents. The Mikero then collects the price that was set when the individual placed the order.

6. Based on my training and experience, I know that one or more persons in completing the process of making false identification documents may fulfill the roles of the Mikero, Runner and/or document manufacturer.

4

7.   To investigate the false document manufacturers, agents use Confidential Informants ("CIs") and Confidential Sources ("CS").  CIs and/or CSs are equipped with hidden video cameras that record both images and sound during transactions with subjects.  They are also equipped with hidden transmitters so that surveilling agents could simultaneously hear the transactions that maybe out of their line of sight.  The CI and/or CS also are provided by law enforcement agents with money to conduct buys and, in some cases, pictures and biographical information to supply to the false document vendors.

## PROCEDURES FOR OBTAINING A PERMANENT RESIDENT CARD

8.  Based on my training and experience with ICE, I am aware of the following:

a.   A United States citizen or legal permanent resident may file a family based immigrant petition seeking permanent residence for his/her alien relative.  A company based in the United States may file an employment-based immigrant petition seeking permanent residence for a potential employee.  The requesting United States citizen, legal permanent resident, or employer is referred to as the "petitioner," and the alien relative or alien employee is referred to as the "beneficiary;"

b.   A petitioner seeking to immigrate his/her relative is required to prove to U.S. Citizenship and Immigration Services ("USCIS") that he/she has a bona fide relationship with the beneficiary.  A petitioner seeking to immigrate an employee must obtain a labor certificate from the U.S. Department of Labor and obtain approval of employment by USCIS;

c.   If USCIS approves the petition and the alien spouse or relative is already residing in the United States in a non-immigrant classification, an interview before a district adjudication officer is required for both the petitioner and the beneficiary. This process is referred to as an "adjustment of status," and can result in the issuance of a Permanent Resident Card (I-551 card) without requiring the alien spouse to leave and re-enter the United States;

d.   If USCIS approves the petition and the alien relative or employee is residing outside the United States, the approved petition is forwarded to the United States Department of State ("DOS") for an immigrant visa interview of the beneficiary. The beneficiary is issued an immigrant visa if the DOS finds the beneficiary admissible. The beneficiary is then eligible to immigrate to the United

States as a lawful permanent resident and receive an I-551 card; and

e. After the petition is granted by USCIS or by DOS, the application is then entered into the USCIS database, the Central Index System ("CIS"). The I-551 is then mailed from a USCIS Service Center to the mailing address provided by the applicant. The applicants' personal identifying information is maintained within the CIS, and a permanent file is maintained in a USCIS office or records center.

### PROCEDURES FOR OBTAINING A SOCIAL SECURITY CARD

9. Based upon my training and experience and conversations with other agents with training and experience in the issuance of Social Security cards, I know that the legal procedures for obtaining a Social Security card are as follows:

a. Service Representatives employed by the Social Security Administration ("SSA") are responsible for interviewing applicants for Social Security numbers ("SSNs"), checking the applicants' identity documents, determining eligibility for a SSN, and issuing Social Security cards;

b. All individual applicants for a SSN must complete a form known as a SS-5, Application for a Social

Security number.  Non-citizens of the United States must visit the SSA office in person to apply for a SSN, and must provide USCIS documentation, establishing lawful residence and proof of identity.  This information is provided to the SSA employee by the applicant and is recorded on the application form;

        c.   In the case of non-citizens, a SSA Service Representative must verify the alien registration numbers ("A-numbers") corresponding to all USCIS documentation provided as proof of lawful residence in the U.S.  The verification is done by querying the A-number in the Central Index System database (CIS), which is accessible through the computer terminal of the SSA employee;

        d.   After the USCIS information is verified, the application is then entered into the SSA database and a SSN is generated.  The Social Security card is then automatically mailed from Baltimore, Maryland, to the mailing address provided by the applicant.  The applicants' personal identifying information is maintained within the SSA.

<b><u>PROBABLE CAUSE</u></b>

**A.   <u>Background</u>**

    10.   On September 26, 2006, I, along with other ICE agents, initiated an investigation of the Viva Mart located

8

at 650 W. La Palma Ave., Anaheim, California, for violations of 18 U.S.C. § 1028 (Fraud and related activity in connection with false identification documents). In 2005, a previous investigation at the Viva Mart resulted in the arrest and conviction of three fraudulent document vendors and the identification of a fraudulent document manufacturing facility (a "mill") located at the RESIDENCE PREMISES in United States v. Perez-Gonzalez, et al., Case No. 05-287-CAS in the Central District of California ("2005 INVESTIGATION").

**B.    The First Buy (Attempted) -- September 26, 2006**

11. On September 26, 2006, I, along with other ICE agents, requested that a Confidential Informant ("CI") go to the Viva Mart to attempt to purchase counterfeit false identification documents from a document vendor operating in and around the Viva Mart (the "FIRST BUY"). The CI was equipped with a video and audio recorder. I instructed the CI not to approach the document vendor, but to allow the counterfeit document vendor to approach and offer to sell him/her counterfeit documents. The CI was provided with three photographs to be used to produce the documents. The biographic information needed to create the documents was written on the back of each photograph, which included a name and a date of birth.

12.   From what I heard over the radio that same day (I was in constant radio contact with all agents present at the operation), what I observed during the FIRST BUY, what was related to me by the CI, and a review of the electronic surveillance taken from the CI on that day, I learned the following:

a.   At approximately 11:40 a.m., the CI approached the Viva Mart to ascertain the availability of false identification documents.  The CI loitered in and around the Viva Mart for several minutes and was not approached by any document vendors.  The CI asked a male Hispanic who was also loitering in front of the Viva Mart if he knew where to buy "micas" (resident alien cards) in the area.  The male Hispanic told the CI that the document vendors were not working because it was "too hot" meaning that there were too many police in the area.

b.   The CI spoke to another male Hispanic in front of the Viva Mart who told the CI to talk to the lady at the BUSINESS PREMISES because the document vendors are always at her store.  The BUSINESS PREMISES is located in the same shopping center as the Viva Mart.

c.   At approximately 11:45 a.m., the CI approached an Asian female (later identified by her Department of Motor Vehicles ("DMV") photograph as Lisa

KWON) working at the BUSINESS PREMISES and asked her about the availability of "micas." Based on documents I obtained from the City of Anaheim, I know that KWON is listed as the owner of the BUSINESS PREMISES. KWON stated that the document vendors had left the area because the vendors thought that there were a lot of police in the area. KWON stated that she could take the photographs and the document vendors would pick the photographs up from her and make the false identification documents. KWON told the CI that the documents would cost $60 each. KWON instructed the CI to give her the photographs and a telephone number. The document vendors would call the CI when the documents were ready. The CI was not in possession of a telephone and told KWON that the CI would just wait for the documents. KWON told the CI that the documents might not be done until the next day and if the CI did not provide a telephone number then she would not make the documents for the CI. The CI told KWON that he would come back when the CI had a telephone and then the CI left the area without completing the purchase.

C.   **January 4, 2008 - Surveillance at the BUSINESS PREMISES**

13.   On January 4, 2008, I, along with Special Agent (SA) Brent Richins, conducted surveillance in the vicinity

of the BUSINESS PREMISES.  The purpose of this surveillance
was to determine if false identification documents were
still being sold at the BUSINESS PREMISES because over a
year had passed since the attempted First Buy and the Viva
Mart had since closed.  During this surveillance, I
observed three male Hispanics loitering in front of the
BUSINESS PREMISES.  I recognized one of the subjects as
Luis Martin ROSAS-Crisostomo because on October 25, 2005,
ROSAS was arrested and deported by ICE agents in connection
with the 2005 INVESTIGATION.

D.   **The Second Buy -- January 8, 2008**

    14.  On January 8, 2008, I, along with other ICE
agents, requested that the CI go to the BUSINESS PREMISES
to purchase false identification documents from the
document vendors operating in and around the BUSINESS
PREMISES  (the "SECOND BUY").  The CI was equipped with a
video and audio recorder.  The CI was provided with money
to purchase the fraudulent identification documents.  The
CI was not provided with photographs and was instructed to
have a photograph taken at the BUSINESS PREMISES to be used
to create the fraudulent identification documents.

    15.  From what I heard over the radio that same day (I
was in constant radio contact with all agents present at
the operation), what I observed during the SECOND BUY, a

review of the notes of SA Suzanne Lenyi who was at the
scene and tasked to write a report of the SECOND BUY, what
was related to me by the CI, and a review of the electronic
surveillance taken from the CI's video and audio recorder,
I learned the following:

      a.   At approximately 11:05 a.m., the CI entered
the parking lot of the BUSINESS PREMISES.  The CI parked
his car and proceeded toward the front of the BUSINESS
PREMISES.  As the CI walked up, ROSAS and an unidentified
male Hispanic wearing a white polo shirt with blue stripes
and a grey jacket ("UM1") was seen by surveilling agents
standing in front of the BUSINESS PREMISES.  A third male
Hispanic wearing a Raiders jacket ("UM2") was seen by
surveilling agents walking toward the front door of
BUSINESS PREMISES.

      b.   ROSAS immediately approached the CI and the
CI asked ROSAS whom he should talk to about a "Mica." ROSAS
asked if the CI needed a "Mica" and a "Seguro," referring
to a resident alien card and a social security card.  The
CI responded "yes."  ROSAS walked the CI to the front of
the BUSINESS PREMISES where UM2 was now waiting.  UM2 was
standing at the front door of the BUSINESS PREMISES telling
and motioning to the CI to enter the BUSINESS PREMISES.  As
they walked into the BUSINESS PREMISES, ROSAS asked the CI

if the CI had a picture.  The CI responded, "no."  ROSAS told the CI that the documents would cost $70.

    c.   Once inside BUSINESS PREMISES, UM2 yelled toward the back of the BUSINESS PREMSIES, "Lisa take a picture."  KWON was then seen coming from the back of the BUSINESS PREMISES.  I recognized KWON as the same person that negotiated the deal to sell counterfeit documents to the CI (same CI) during the FIRST BUY.  KWON gestured for the CI to follow her.  KWON, with a digital camera in hand, took the CI to a make-shift photo booth inside the BUSINESS PREMISES and took the CI's picture.

    d.   The CI walked out of the photo booth and asked UM2 what to do next.  KWON followed the CI out of the photo booth with the digital camera and proceeded toward the rear of the BUSINESS PREMISES to print the picture using a computer or printer.  UM2 instructed the CI that he/she needed the name and date, referring to the name and birth date that was to be placed on the resident alien card.  The CI and UM2 walked toward the counter at the rear of the BUSINESS PREMISES where KWON appeared to be preparing the CI's photograph.  The CI asked UM2 how long it would take to get the documents and UM2 stated that it would be an hour and a half.

e.   UM2 directed the CI to come to the front of the BUSINESS PREMISES.  UM2 provided the CI with an envelope that had been cut in half to write the name and birth date needed to manufacture the documents.   The CI wrote "Alejandro Romero Arce, 4 Mayo 1970" on the envelope. After preparing the envelope, the CI walked back to the counter and paid KWON $8 for the photograph.

f.   UM2 handed KWON the envelope that contained the CI's name and birth date.   KWON placed the CI's photograph in the envelope and handed the envelope back to UM2.  UM2 told the CI that the documents would be ready in an hour and a half.

g.   At approximately 11:15 a.m., the CI left the area to wait for the documents to be created.

h.   At approximately 12:30 p.m., the CI returned to the BUSINESS PREMISES to check on the status of the documents.

i.   As the CI approached the front door of BUSINESS PREMISES, ROSAS greeted the CI and again asked the CI if the CI needed a "mica."  The CI explained that the CI was waiting for a "mica."  ROSAS told the CI that the guy with the documents would be back in a few minutes.

j.    At approximately 12:50 p.m., an unknown male Hispanic (UM3) wearing a brown jacket handed the CI the false identification documents.  The documents were provided to the CI in the envelope that had the CI's name and birth date written on it.  After receiving the documents from UM3, the CI paid a different unknown male Hispanic (UM4) $70 for one counterfeit resident alien card and one counterfeit social security card.

16.  Based on a review of surveillance video from the 2005 INVESTIGATION, I recognized UM2 as being present during several of the previous buys.  UM2 appeared to be acting as a look out for the document vendors during the 2005 INVESTIGATION.  UM2 was not identified or apprehended during the 2005 INVESTIGATION.

17.  The CI gave agents the documents that the CI bought during the SECOND BUY.  I reviewed the counterfeit government documents that were supplied to the CI by ROSAS, KWON, and the other unknown vendors during the SECOND BUY, which are described as follows:

a.    One Resident Alien Cards with the name Alejandro Romero-Arce and a date of birth of 05/04/70.  The A-number on the card was AXXXXX9700.  From searching the CIS, I was able to determine that AXXXXX9700 is unassigned.

b.   The Social Security card number supplied by the document vendors to the CI for Alejandro Romero-Arce was XXX-XX-5786.  At this time, I have been unable to determine if this Social Security number has been assigned.

c.   From my experience, these false identification documents appear to be issued by or under the authority of the United States.  Based on my experience, these false identification documents appeared to be created using a typewriter and a laminator.

**E.   January 18, 2008 Surveillance at BUSINESS PREMISES**

18.   On January 18, 2008, I, along with other ICE agents, conducted surveillance of ROSAS and other unknown counterfeit document vendors operating at the BUSINESS PREMISES.

19.   From what I heard over the radio that same day (I was in constant radio contact with all agents present at the operation), my own observations, and the observations SA Juan Munoz, who was present and conducting surveillance from a stationary surveillance vehicle located in the parking lot of the BUSINESS PREMISES, I learned the following:

a.   At approximately 11:30 a.m., SA Juan Munoz observed UM4 and ROSAS in front of the BUSINESS PREMISES, whom he recognized from surveillance video taken during the

17

SECOND BUY.  Based on SA Munoz's training and experience, ROSAS and UM4 appeared to be engaged in the selling of false identification documents.

b.   SA Munoz observed UM4 driving a silver Ford F-150 bearing California license 7A76147.  DMV records that I reviewed show that the this vehicle is a 2003 Ford F-150 registered to Jose REYES, 140 W. Hill Ave. #15, Fullerton, CA.

c.   Several times during the surveillance, SA Munoz observed a white Dodge van bearing California license 3UNS286 in the parking lot of the BUSINESS PREMISES.  Each time the van entered the parking lot, the driver would get out of the van and briefly meet with UM4 and ROSAS.  DMV records that I reviewed show that the Dodge van is registered to Guillermo RAMIREZ at the RESIDENCE PREMISES.

d.   During the 2005 INVESTIGATION, agents executed a federal search warrant at the RESIDENCE PREMISES.  During the search, a mill was located in the garage.  RAMIREZ denied all knowledge of the false document manufacturing activity that was taking place in the garage at the RESIDENCE PREMISES and stated that he had rented the garage to the target of the investigation, Narciso PEREZ. RAMIREZ was determined to be in removal proceedings and out on immigration bond pending his removal hearing.  Based on

the evidence seized at RAMIREZ's residence, RAMIREZ was arrested and his immigration bond was revoked.   RAMIREZ was granted voluntary departure by the immigration judge and departed from the United States on December 20, 2005.

     e.   I showed SA Munoz a photograph of RAMIREZ taken during the 2005 INVESTIGATION and SA Munoz identified the driver of the Dodge Van as RAMIREZ.

     f.   At approximately 1:50 p.m., SA Munoz observed UM4 getting into the silver Ford F-150 and leaving the parking lot.  I, along with other agents, followed UM4 to 140 W. Hill Ave., Fullerton, CA., the registered address for the vehicle.

**F.**   **The Third Buy -- April 29, 2008**

    20.   On April 29, 2008, I, along with other ICE agents, requested that the CI go to the BUSINESS PREMISES to purchase false identification documents from document vendors operating in and around the BUSINESS PREMISES (the "THIRD BUY").  The CI was equipped with a video and audio recorder.  Agents provided the CI with five photographs with names and birth dates on the back of each photograph, to be used to create the fraudulent Resident Alien Cards and Social Security Cards.  The CI was provided with money to purchase the fraudulent identification documents.

21.   From what I heard over the radio that same day (I was in constant radio contact with all agents present at the operation), my own observations, the observations SA Juan Munoz, who was present and conducting surveillance from a stationary surveillance vehicle located in the parking lot of BUSINESS PREMISES, and a review of the electronic surveillance from the CI's video and audio recorder, I learned the following:

a.   At approximately 12:15 p.m., SA Munoz observed a Ford Expedition bearing California license 5HWR963 parked near the BUSINESS PREMISES.  I provided SA Munoz with the description of ROSAS' vehicle that I had obtained during a previous surveillance.  Agents confirmed that the Ford Explorer seen that same day was the same vehicle that ROSAS was observed driving during prior surveillances.  SA Munoz also observed UM3 from the SECOND BUY riding up to BUSINESS PREMISES on a bicycle.  During the 2005 INVESTIGATION, the documents were also transported to and from the mill on a bicycle.

b.   At approximately 12:28 p.m., SA Munoz observed the CI approach the BUSINESS PREMISES and make contact with ROSAS.

c.    The CI approached ROSAS in front of the BUSINESS PREMISES and said "micas." ROSAS responded "how many?" The CI told ROSAS "three" and then ROSAS asked the CI if the CI had the names (referring to the names to put on the documents). The CI and ROSAS then entered BUSINESS PREMISES to conduct the transaction.

d.    Inside the BUSINESS PREMISES, the CI provided ROSAS with the photographs that were provided to the CI by agents. ROSAS asked the CI if the names were on the photographs and the CI responded "yes." ROSAS agreed to manufacture the documents for $60 per set; each set included a social security and a resident alien card. ROSAS asked the CI for a phone number that he could contact the CI when the documents were ready. The CI provided ROSAS with the number to a cellular telephone that had been provided to the CI by agents. ROSAS wrote the number on the envelope that contained the photographs.

e.    At approximately 12:30 p.m., SA Munoz observed the CI leave the BUSINESS PREMISES. The CI entered a restaurant adjacent to the BUSINESS PREMISES and immediately came back out and proceeded to his vehicle. The CI left the area to wait for the documents to be completed.

f.    At approximately 12:35 p.m., SA Munoz observed UM3 leaving the BUSINESS PREMISES and proceeding out of the shopping center on the bicycle.

g.    Based on the fact that UM3 delivered the counterfeit documents to the CI during the SECOND BUY and UM3 was inside the BUSINESS PREMISES with ROSAS after the CI provided the photographs to ROSAS, agents began surveillance of UM3 as he left the shopping center on the bicycle.

h.    I observed UM3 riding out of the shopping center southbound on Citron St.  I followed UM3 as he rode south on Citron St., east on North St., North on Clementine St., and west on La Verne St.

i.    I observed UM3 ride north in an alley located between Clementine St. and Dickel St.

j.    At approximately 12:40 p.m., I observed UM3 enter the RESIDENCE PREMISES through a gate in the alley.

k.    During the 2005 INVESTIGATION, the subject that transported the documents to the document mill entered the RESIDENCE PREMISES through the same gate in the alley and was traveling on a bicycle.

l.   At approximately 1:30 p.m., I observed UM3 riding out of the alley westbound on La Verne St.   I maintained surveillance of UM3 until he turned north on Citron St.   SA Pete Diaz observed UM3 turn north on Citron St. and ride back to into the parking lot of the BUSINESS PREMISES.

m.   At approximately 1:36 p.m., SA Munoz observed UM3 arriving back at the BUSINESS PREMISES.   UM3 entered the BUSINESS PREMISES where ROSAS was already located.

n.   Immediately after UM3 arrived at the BUSINESS PREMISES, the CI received a telephone call from ROSAS. ROSAS told the CI that the documents were ready.   I reviewed the incoming calls on the CI's cell telephone. The review of the incoming calls revealed that ROSAS called the CI from phone number (714) 809-3877 at 1:36 p.m. on April 29, 2008.

o.   At approximately 1:44 p.m., SA Munoz observed the CI entering the BUSINESS PREMISES to pick up the documents.

p.   As the CI walked up to the entrance of the BUSINESS PREMISES, UM3 was seen sitting in front of the BUSINESS PREMISES with UM2, who participated in the SECOND BUY at the BUSINESS PREMISES.

q.   The CI entered the BUSINESS PREMISES and made contact with ROSAS right inside the doorway.  ROSAS retrieved the envelope containing the documents from a rental DVD case located on a display shelf inside the BUSINESS PREMISES.  ROSAS gave the documents to the CI and the CI paid ROSAS $300 for the five fraudulent resident alien cards and five fraudulent social security cards.

r.   The CI asked ROSAS for a telephone number that ROSAS could be reached at to purchase additional documents. ROSAS provided the CI with a business card for a long distance phone service company called Liberty International.  The card contained the telephone number (714) 809-3877 and "Luis & Antonia ROSAS" are listed on the card as independent representatives of Liberty International.  This telephone number is the same number that ROSAS used to call the CI earlier that day.

s.   At approximately 1:45 p.m., SA Munoz observed the CI leaving the BUSINESS PREMISES.  The CI left the area and surveillance was terminated.

22.   The CI gave agents the documents that he bought during the THIRD BUY.  The documents were contained in an envelope that had been cut in half and had the telephone number given to ROSAS by the CI written on it.  In addition to the telephone number, the envelope also had the phrases

"el pelon" and "5 peg" written on it.  Based on my training and experience, I know that "el pelon" is a nickname commonly used by Hispanic males that are bald or have really short hair.  I also know that ROSAS has a shaved head and I believe, based on my training and experience, that this nickname on the envelope appears to be a way to track the fraudulent documents that ROSAS sells.  The phrase "5 peg" appears to represent the number of documents purchased.  I reviewed the false identification documents that were supplied to the CI by ROSAS during the THIRD BUY, which are described as follows:

a.   Five Permanent Resident Alien Cards with numbers # AXXXXX1122, # AXXXXX6537, # AXXXXX9700, #AXXXXX6040, and #AXXXXX6537 with the names of Alberto Romero-Gonzalez, Gilberto Santana-Ramirez, Fernando Aguilera-Garcia, Maricela Martinez-Soto, and Monica Martinez-Estrada, respectively.  From searching CIS, I was able to determine that # AXXXXX1122 is assigned to Yun Qing LIN, # AXXXXX6537 is assigned to Maria ALMAZAN-Lozano, # AXXXXX9700 is unassigned, # AXXXXX6040 is assigned to Gareth Burton, and # AXXXXX6537 is assigned to Maria ALMAZAN-Lozano.

b.   The social security card numbers supplied to the CI for Alberto Romero-Gonzalez, Gilberto Santana-

Ramirez, Fernando Aguilera-Garcia, Maricela Martinez-Soto,
and Monica Martinez-Estrada are XXX-XX-5511, XXX-XX-5451,
XXX-XX-5561, XXX-XX-5611, and XXX-XX-5451 respectively.  At
this time, I have been unable to determine if these Social
Security numbers have been assigned.

      c.   From my experience, these fraudulent
government documents appear to be issued by or under the
authority of the United States.  Based on my experience,
these false identification documents appeared to be created
using a typewriter and a laminator.

**G.   The Fourth Buy -- May 13, 2008**

     23.  On May 13, 2008, I, along with other ICE agents,
requested that the CI go to the BUSINESS PREMISE to
purchase false identification documents from document
vendors operating in and around the BUSINESS PREMISES (the
"FOURTH BUY").  The CI was equipped with a video and audio
recorder.  I provided the CI with five photographs with
names and birth dates on the back of each photograph, to be
used to create the fraudulent Resident Alien Cards and
Social Security Cards.  I provided the CI with money to
purchase the fraudulent identification documents.

     24.  From what I heard over the radio that same day (I
was in constant radio contact with all agents present at
the operation), my own observations, the observations SA

Juan Munoz, who was present and conducting surveillance from a stationary surveillance vehicle located in the parking lot of the BUSINESS PREMISES, and the electronic surveillance from the CI's video and audio recorder, I learned the following:

a.   At approximately 12:15 p.m., SA Munoz observed UM2 standing in front of a laundry mat located to the north of the BUSINESS PREMISES in the same shopping center.

b.   At approximately 12:21 p.m., SA Munoz observed the CI approach the BUSINESS PREMISES and make contact with ROSAS.  The CI and ROSAS exchanged words and immediately entered the BUSINESS PREMISES.

c.   Several minutes later, SA Munoz observed the CI walk out of the BUSINESS PREMISES and enter a Mexican restaurant that is located next to the BUSINESS PREMISES. ROSAS remained inside the BUSINESS PREMISES.  Within a minute or two, SA Munoz observed the CI walk out of the Mexican restaurant and leave the area.

d.   While the CI was meeting with ROSAS inside the BUSINESS PREMISES, SA Munoz observed a stocky Hispanic male, between 5'4" – 5'6," wearing a blue T-shirt and blue jeans (later identified as Guillermo RAMIREZ, the owner of the BUSINESS PREMISES) standing outside of the BUSINESS

PREMISES.  RAMIREZ was involved in a conversation with
other unknown Hispanic males that were also standing
outside of the BUSINESS PREMISES.  SA Munoz observed
RAMIREZ go inside the BUSINESS PREMISES during the time the
CI was inside with ROSAS.

   e.  Shortly after the CI left BUSINESS PREMISES,
RAMIREZ left BUSINESS PREMISES, hopped on a bicycle, and
rode out of the parking lot eastbound on La Palma Ave.

   f.  At approximately 12:40 p.m., I observed
RAMIREZ riding the bicycle east on La Palma Ave.  I, along
with SA Jay Pettibone, observed RAMIREZ turn south from La
Palma Ave. into the alley that runs behind the RESIDENCE
PREMISES and enter the RESIDENCE PREMISES through the gate
in the alley.  This is the same gate used by the UM3 during
the THIRD BUY.

   g.  At approximately 1:40 p.m., SA Munoz
observed RAMIREZ parking a lime-green vehicle bearing
California license 498CBW in a parking spot that was
located near the front entrance of BUSINESS PREMISES.
RAMIREZ was observed exiting this vehicle and entering the
BUSINESS PREMISES.  SA Munoz also observed an unknown
Hispanic male ("UM5") wearing a white T-shirt and black and
white camouflage pants come out of the BUSINESS PREMISES,
whistle, and make hand signals to UM2, who was standing

near the entrance to the laundry mat, attempting to get his attention.  UM2 acknowledged UM5, and then UM2 walked over and entered BUSINESS PREMISES with UM5, where ROSAS and RAMIREZ were already located.  Based on my training and experience, this activity is consistent with the delivery and distribution of counterfeit government documents.

        h.   Moments after RAMIREZ arrived at the BUSINESS PREMISES, ROSAS called the CI and told the CI that the documents were ready.

        i.   At approximately 1:45 p.m., SA Munoz observed the CI enter the BUSINESS PREMISES and then leave a few minutes later.

        j.   I reviewed the electronic surveillance and it revealed that inside the BUSINESS PREMISES, the CI paid ROSAS $300 for the five resident alien cards and five social security cards.

    25.  The CI gave agents the documents that he bought during the FOURTH BUY.  The documents were contained in an envelope that had been cut in half.  The envelope again had the phrases "el pelon" and "5 peg" written on it.  I reviewed the false identification documents that were supplied to the CI by ROSAS during the FOURTH BUY, which are described as follows:

a.    Five Permanent Resident Alien Cards with numbers # AXXXXX6040, # AXXXXX1290, # AXXXXX1122, # AXXXXX9700, and # AXXXXX6537 with the names of Javier ROMERO-Alvarez, Alejandro SANTANA-Ramirez, Guillermo ROMERO-Soto, Jose PEREZ-Rojas, and Manuel RAMIREZ-Gonzalez, respectively.  From searching CIS, I was able to determine that # AXXXXX6040 is assigned to Gareth Burton, # AXXXXX1290 is assigned to Martin FRASER, # AXXXXX1122 is assigned to Yun Qing LIN, # AXXXXX9700 is unassigned, and # AXXXXX6537 is assigned to Maria ALMAZAN-Lozano.

b.    The A numbers on four of the five resident alien cards purchased during the FOURTH BUY were the same as the A numbers printed on the resident alien cards purchased during the THIRD BUY.

c.    The social security card numbers supplied to the CI for Javier ROMERO- Alvarez, Alejandro SANTANA-Ramirez, Guillermo ROMERO-Soto, Jose PEREZ-Rojas, Manuel RAMIREZ-Gonzalez were XXX-XX-0310, XXX-XX-5612, XXX-XX-6710, XXX-XX-0015, and XXX-XX-0412, respectively.  At this time, I have been unable to determine if these Social Security numbers have been assigned.

d.    From my experience, these false identification documents appear to be issued by or under the authority of the United States.  Based on my

30

experience, these false identification documents appeared to be created using a typewriter and a laminator.

**H.    The Fifth Buy -- May 15, 2008**

26.    On May 15, 2008, I, along with other ICE agents, requested that a Cooperating Source ("CS") go to the BUSINESS PREMISES to purchase false identification documents from document vendors operating in and around BUSINESS PREMISES (the "FIFTH BUY").  I provided the CS with two photographs with the names and birth dates written on the back of each photograph, to be used to create the counterfeit Resident Alien Cards and Social Security Cards. The CS was also instructed to have a photograph taken at the BUSINESS PREMISES to be used to create false identification documents for the CS.  I provided the CS with money to purchase the fraudulent identification documents and the photograph.  The CS was also equipped with a video and audio recorder.

27.    From what I heard over the radio that same day (I was in constant radio contact with all agents present at the operation), my own observations, the observations of SA Juan Munoz, who was present and conducting surveillance from a stationary surveillance vehicle located in the parking lot of BUSINESS PREMISES, and the electronic

surveillance from the CS' video and audio recorder, I learned the following:

      a.   At approximately 12:25 p.m., SA Edward Angeo observed UM3 from the previous buys riding south on Clementine St. away from the RESIDENCE PREMISES. SA Angeo identified UM3 from photographs I provided to him prior to this buy.

      b.   At approximately 12:30 p.m., SA Munoz observed UM3 arrive at the BUSINESS PREMISES and enter the BUSINESS PREMISES. Immediately after UM3 arrived, SA Munoz saw UM2 follow UM3 into BUSINESS PREMISES.

      c.   A few minutes later, SA Munoz observed UM2 leaving the BUSINESS PREMISES. UM2 was observed entering the laundry mat and placing some unknown small objects in or on what appeared to be a counter or a shelf that is located near the entrance of the laundry mat.

      d.   SA Taylor Johnson was inside the laundry mat and observed UM2 placing what appeared to be false identification documents under a division in-between the washing machines. SA Johnson recognized UM2 from photographs that I had provided to her prior to this buy. The documents were separated by small slips of paper, which appeared similar to the slips of paper that contained the counterfeit documents during all the previous buys. Based

on my experience, I know that document vendors use these slips of paper to organize the cards for the different customers and to keep track of what cards go to what vendor.

    e.   SA Munoz then observed UM2 standing in front of the laundry mat entrance. UM2 met with a group of 4-5 individuals (suspected card buyers) directly in front of the laundry mat entrance.

    f.   From inside the laundry mat, SA Johnson observed UM2 giving what appeared to be fraudulent documents to the suspected card buyers. UM2 had retrieved the documents from under the divider between the washers, walked towards a vending machine on the southwest side of the laundry mat, and gave the unknown individuals the documents without the slips of paper. UM2 then placed the slips of paper in his pocket.

    g.   At approximately 12:32 p.m., SA Munoz observed the CS approach ROSAS in front of the BUSINESS PREMISES. ROSAS and the CS spoke briefly and then entered the BUSINESS PREMISES.

    h.   Prior to entering BUSINESS PREMISES, the electronic surveillance revealed that ROSAS agreed to sell the CS counterfeit documents for $70 per set. ROSAS and the CS then entered the BUSINESS PREMISES to take the CS'

photograph.   ROSAS yelled to someone inside the store, "Take a picture my friend" and an unknown Asian male took the CS into the photo booth and took the CS' picture.

       i.   After the picture was taken, ROSAS confirmed the names that were written on the backs of the photographs with the CS and told the CS that the cards would be ready in an hour and a half.  The CS then left the BUSINESS PREMISES to wait for the documents to be completed.

       j.   At approximately 12:37 p.m., SA Munoz observed RAMIREZ in front of the BUSINESS PREMISES talking with ROSAS and other unknown suspected document vendors.

       k.   At approximately 1:20 p.m., SA Munoz observed UM3 get on the bicycle and ride out of the parking lot toward Citron St.  SA Pete Diaz observed UM3 riding south on Citron St. and turn east on Laverne St.  I observed UM3 ride east on Laverne St. and turn north in the alley behind the RESIDENCE PREMISES.

       l.   At approximately 1:27 p.m., I observed UM3 enter the RESIDENCE PREMISES through the gate in the alley.

       m.   At approximately 2:18 p.m., I observed UM3 riding out of the alley on a bicycle and heading back towards the BUSINESS PREMISES.

n.   At approximately 2:25 p.m., SA Munoz observed UM3 arriving at the BUSINESS PREMISES.   Once again, ROSAS and UM2 followed UM3 into BUSINESS PREMISES.

p.   A few minutes later, UM2 was observed leaving the BUSINESS PREMISES and walking over to the laundry mat where he remained standing near the entrance. Shortly thereafter, two individuals were observed walking over to the laundry mat and meeting with UM2.   The two individuals then left the area in a vehicle.

q.   At approximately 2:28 p.m., ROSAS approached the CS, who was waiting near BUSINESS PREMISES, and told the CS that the documents were ready.  The CS followed ROSAS into the BUSINESS PREMISES where the CS paid ROSAS $210 for three resident alien cards and three social security cards. The CS then left the area and surveillance was terminated.

28. The CS gave agents the documents the CS bought during the FIFTH BUY.  The three sets of documents were in separate envelopes that had been cut in half.  The envelope again had the phrase "el pelon" written on them.   In addition to "el pelon," the envelopes all had the phrase "1mp" written on them.  This appears to represent the number of document sets contained in each envelope.  I reviewed the false identification documents that were

35

supplied to the CS by ROSAS during the FIFTH BUY, which are described as follows:

a.   Three Permanent Resident Alien Cards with numbers # AXXXXX6454, # AXXXXX6537, and # AXXXXX1122 with the names Hortencia MERCADO-Rivera, Lupe SANDOVAL-Garcia, and Raul MENDEZ respectively.   From searching CIS, I was able to determine that # AXXXXX6454 is assigned to Rafik ELYAS, # AXXXXX6537 is assigned to Maria ALMAZAN-Lozano, and # AXXXXX1122 is assigned to Yun Qing LIN.

b.   The A numbers on two of the three resident alien cards purchased during the FIFTH BUY matched the A numbers printed on the resident alien cards purchased during the THIRD BUY and FOURTH BUY.

c.   The social security card numbers supplied by the document vendor to the CS for Hortencia MERCADO-Rivera, Lupe SANDOVAL-Garcia, and Raul MENDEZ all contained the same social security number, XXX-XX-5611.   At this time, I have been unable to determine if this social security number has been assigned.

d.   From my experience, these counterfeit government documents appear to be issued by or under the authority of the United States.   Based on my experience, these false identification documents appeared to be created using a typewriter and a laminator.

I.   **The Sixth Buy -- July 29, 2008**

29.  On July 29, 2008, I, along with other ICE agents, requested that the CI go to the BUSINESS PREMISES to purchase false identification documents from document vendors operating in and around the BUSINESS PREMISES (the "SIXTH BUY"). The CI was equipped with a video and audio recorder. I provided the CI with five photographs with the names and birth dates written on the back of each photograph, to be used to create the counterfeit Resident Alien Cards and Social Security Cards. I also provided the CI with money to purchase the fraudulent identification documents.

30.  From what I heard over the radio that same day (I was in constant radio contact with all agents present at the operation), my own observations, the observations SA Juan Munoz, who was present and conducting surveillance from a stationary surveillance vehicle located in the parking lot of the BUSINESS PREMISES, and the electronic surveillance from the CI's video and audio recorder, I learned the following:

a.   At approximately 3:45 p.m., SA Munoz observed UM2, UM3, and UM4 loitering in the area of BUSINESS PREMISES.

b.   At approximately 3:51 p.m., SA Munoz observed the CI walk into the BUSINESS PREMISES.

c.   As the CI entered the BUSINESS PREMISES, UM3 was seen standing in the doorway and UM4 was seen standing right inside the doorway.

d.   The CI made contact with UM4 inside the BUSINESS PREMISES.  The CI told UM4 that the CI needed "five" (referring to five sets of counterfeit documents).

e.   The CI handed UM4 the photographs that I had provided to the CI.  UM4 asked the CI what kind of cards the CI wanted.  The CI told UM4 that the CI wanted the "cheap ones."  UM4 told the CI that the documents would cost $50 per set.

f.   UM4 confirmed the names that were to be placed on the documents with the CI and then told the CI that the cards would be ready in two hours.

g.   UM4 asked the CI for a telephone number where the CI could be reached when the documents were ready.  The CI told UM4 that the CI would wait in the area for the documents to be completed.

h.   At approximately 3:54 p.m., SA Munoz observed the CI walking out of the BUSINESS PREMISES.

i.   At approximately 3:57 p.m., SA Munoz observed UM3 walk out of the BUSINESS PREMISES and ride out of the parking lot on a bicycle.  I observed UM3 ride out of the parking lot south on Citron St. and turn eastbound on La Verne St toward the RESIDENCE PREMISES.

j.   At approximately 5:14 p.m., SA Munoz observed UM2 leaving the BUSINESS PREMISES on a bicycle. Agents followed UM2 to an apartment complex located at 140 Hill St., Fullerton, CA.  Agents followed UM4 to this same address during a previous surveillance.

k.   At approximately 5:26 p.m., SA Munoz observed UM3 return to the BUSINESS PREMISES in a lime-green Ford Maverick driven by RAMIREZ, the owner of the RESIDENCE PREMISES.  RAMIREZ and UM3 got out of the car and entered BUSINESS PREMISES.

l.   Immediately after RAMIREZ and UM3 arrived, UM4 signaled to the CI, who was waiting in a vehicle in the parking lot, that the documents were ready.

m.   At approximately 5:27 p.m., the CI walked back into the BUSINESS PREMISES where RAMIREZ, UM3, and UM4 were already located.  I reviewed the electronic surveillance and it revealed that the CI made contact with UM4 inside the BUSINESS PREMISES near a shelf containing rental videos.  UM4 retrieved an envelope that contained

39

the documents from the shelf and handed it to the CI.  The
CI then paid UM4 $250 for the five resident alien cards and
five social security cards.

n.   At approximately 5:30 p.m., SA Munoz
observed the CI leave the BUSINESS PREMISES.

31.   The CI gave agents the documents the CI bought
during the SIXTH BUY.  The documents were contained in an
envelope that had been cut in half.  The envelope had the
letters "BKT" and "5 pg" written on it.  I reviewed the
false identification documents that were supplied to the CI
by UM4 during the SIXTH BUY, which are described as
follows:

a.   Five Permanent Resident Alien Cards with
numbers # AXXXXX7845, # AXXXXX9700, # AXXXXX6040,
# AXXXXX6537, and # AXXXXX7645 with the names of Eduardo
ESTRADA, Juan Carlos REYNOSO, Jose Luis ALVARADO, Juan
CASTILLO, and Juan MACIAS, respectively.  From searching
CIS, I was able to determine that # AXXXXX7845 is assigned
to Dora SAAVEDRA DE TORRES, # AXXXXX9700 is unassigned,
# AXXXXX6040 is assigned to Maria ALMAZAN-Lozano,
# AXXXXX6537 is assigned to Gerardo PORTILLO SANTOS, and
# AXXXXX7645 is assigned to Gareth BURTON.

b.   The social security card numbers supplied to the CI for Eduardo ESTRADA, Juan Carlos REYNOSO, Jose Luis ALVARADO, Juan CASTILLO, and Juan MACIAS were XXX-XX-2567, XXX-XX-3461, XXX-XX-6811, XXX-XX-6711, and XXX-XX-5761 respectively.  At this time, I have been unable to determine if these Social Security numbers have been assigned.  Based on my experience, these false identification documents appeared to be created using a typewriter and a laminator.

c.   From my experience, these false identification documents appear to be issued by or under the authority of the United States.

## J.   Computer Data

32.  Based upon my training and experience and information related to me by agents and others involved in the forensic examination of computers, I know that computer data can be stored on a variety of systems and storage devices including hard disk drives, floppy disks, compact disks, magnetic tapes and memory chips.  I also know that during the search of the premises it is not always possible to search computer equipment and storage devices for data for a number of reasons, including the following:

a.   Searching computer systems is a highly technical process, which requires specific expertise and

specialized equipment. There are so many types of computer hardware and software in use today that it is impossible to bring to the search site all of the necessary technical manuals and specialized equipment necessary to conduct a thorough search. In addition, it may also be necessary to consult with computer personnel who have specific expertise in the type of computer, software application or operating system that is being searched.

b.   Searching computer systems requires the use of precise, scientific procedures which are designed to maintain the integrity of the evidence and to recover "hidden," erased, compressed, encrypted or password-protected data. Computer hardware and storage devices may contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. Since computer data is particularly vulnerable to inadvertent or intentional modification or destruction, a controlled environment, such as a law enforcement laboratory, is essential to conducting a complete and accurate analysis of the equipment and storage devices from which the data will be extracted.

c.   The volume of data stored on many computer systems and storage devices will typically be so large that it will be highly impractical to search for data during the

innocuous file in a process called "steganography." For example, by using steganography a computer user can conceal text in an image file which cannot be viewed when the image file is opened.  Therefore, a substantial amount of time is necessary to extract and sort through data that is concealed or encrypted to determine whether it is evidence, contraband or instrumentalities of a crime.

## CONCLUSION

33.  Based on the foregoing, I respectfully submit that there is probable cause to search the SUBJECT PREMISES for evidence of production of false identification documents and possession of document-making implements in violation of Title 18, United States Code Sections 1028(a)(1) and 1028 (a)(5).  In addition, I submit there is probable cause to believe that Luis Martin ROSAS-Crisostomo and Guillermo RAMIREZ have violated 18 U.S.C. § 1028(a)(1) (Producing False Identification Documents) and 18 U.S.C. § 2 (Aiding and Abetting).

SPECIAL AGENT TROY KENNEDY
IMMIGRATION CUSTOMS ENFORCEMENT

Subscribed and sworn to before me this _____ day of August 2008.

MARC L. GOLDMAN
UNITED STATES MAGISTRATE JUDGE